# UNITED STATES DISTRICT COURT

for the
Southern District of Texas

United States Courts
Southern District of Texas
FILED

SEP 1 9 2014

David J. Bradley, Clerk of Court

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )      Case No. H14-938
)
an Apple iPhone 5, IMEI 013986001243224 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
an Apple iPhone 5, IMEI 013986001243224

located in the ____Southern____ District of ____Texas____, there is now concealed *(identify the person or describe the property to be seized)*:

the telephone number of the device, contact names and telephone numbers, caller ID for incoming calls, dialed numbers, digital photographs and video, incoming and outgoing text messages, and other stored information.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☐ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8 USC 1324 | Alien Smuggling |

The application is based on these facts:
See attached Affidavit in Support of a Search Warrant

☒ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Laura Gill, Special Agent
_____
Printed name and title

Sworn to before me and signed in my presence.

Date: September 19, 2014

_____
Judge's signature

City and state: Houston, Texas

Frances H. Stacy, United States Magistrate Judge
_____
Printed name and title

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE | § | MISC. NO |
| SEARCH OF ONE (1) | § | H14-938 |
| ELECTRONIC DEVICES | § | |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, Laura J Gill, a Special Agent with U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI), being duly sworn, depose and state:

1. I am a Special Agent (SA) with the U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) duly appointed according to law and acting as such, and have been employed by HSI since July 2009. I was an Immigration Enforcement Agent (IEA) with Enforcement and Removal Operations (ERO) Immigration and Customs Enforcement from July 2007 through July 2009. In connection with my official duties, I have specialized knowledge of criminal and civil violations of immigration laws to include the transport or harboring of illegal aliens, and methods perpetrated to circumvent those laws. I have gained this knowledge as a result of both professional experience described above and professional training received in the enforcement of laws concerning illegal immigration as found in Title 8 of the United States Code.

2. I have received numerous courses of instruction from the United States U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations relative to the investigative techniques and the conducting of immigration crimes and financial investigations. I have participated in and have conducted investigations which have resulted in the arrests of individuals

1

who have transported, harbored or conspired to transport/harbor illegal aliens. In addition, I have conducted, in connection with these and other cases, follow up investigations concerning the concealment of proceeds derived, to include reviewing assets and the identification of co-conspirators through the use of ledgers, telephone bills and records, photographs and bank checks, as related to transporting and harboring illegal aliens.

3. I am familiar with the ways in which individuals who transport/harbor illegal aliens conduct their business, including, but not limited to, their methods of transporting and hiding the illegal aliens; their use of traditional mobile telephones, direct connect mobile telephones, digital display paging devices, and their use of numerical codes and code words to conduct transactions. I am also familiar with the ways in which individuals who transport/harbor illegal aliens and people associated use mobile telephones and the various functions and applications of mobile telephones such as sending, receiving and storing emails; sending, receiving and storing text messages, which is commonly referred to as short message system (SMS), to communicate with each other concerning their criminal activity and events surrounding their criminal activity. Illegal aliens smugglers routinely use cellular mobile devices to contact family members of smuggled illegal aliens to arrange buy-outs, as well as utilizing cellular mobile devices to contact others involved in the conspiracy to transport/harbor illegal aliens. Those who transport/harbor illegal aliens also utilize global positioning system devices as a navigational to assist in locating addresses. I also know that these individuals who transport/harbor illegal aliens often use their mobile telephones to store information and data such as names, addresses and telephone numbers of co-conspirators; calendar information including dates; entries and notations of events and circumstances concerning their criminal activity; and audio and video files of events associated with their criminal activity.

4. I know that devices commonly referred to as "tablets," along with computers, both desktop and laptop, are also used to communicate and store information through various applications and programs in an effort to further the illicit activity of individuals who transport/harbor illegal aliens. Furthermore, based on my knowledge, training, and experience and information related by agents involved in the forensic examination of computers, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. I know that electronic files downloaded to a hard drive can be stored for years at little or no cost, and that even when files have been deleted, they can often be recovered months or years later using readily available forensic investigative tools. I have learned from computer experts that when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. The same is true for electronic devices such as certain mobile telephones and tablet devices; files or remnants of such files can be recovered months or years later, even if deleted.

5. Consequently, I know that deleted files, or remnants of deleted files, may reside in "free space" or "slack space" (these terms each describe the space on the hard drive that is not currently being used by an active file) for long periods of time before they are overwritten. In addition, I know that a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, I know that files that have been viewed via the Internet are typically automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

3

6. I know that portable electronic devices, such as certain cell phones and tablet computers have evolved to the point that they are in essence miniaturized "computers" unto themselves, and capable of performing many of the same functions as a traditional desktop computer. These devices allow users to conduct transactions, interact with their surroundings, and communicate with people irrespective of location, and combined with the diversity of applications and their multi-functional utility (business, financial, social, commerce, communication, education, organization, personal, and other uses/applications), they are often inseparable from the user. These devices can and do store the same types of records that are stored on desktop and laptop computers. As a result, these portable devices often follow the user on a full-time basis and provide him/her with a readily available means to carry out a variety of tasks. These portable devices (and installed applications) are often integrated with and capable of accessing the data and files contained on a user's home and/or work computer systems. Updates that occur on one device can be accessible and available from any of the devices (computer, laptop, cell phone, and/or tablet device, etc.) connected to this network.

7. Furthermore, based upon my training and experience, I know that illegal alien traffickers frequently utilize such mobile devices, tablets, and/or computers to converse with co-conspirators, to communicate before, during, and after the commission of their criminal acts, to communicate location to one another and so on. Because I know that people involved in immigration smuggling, and laundering of the proceeds from these activities, commonly use mobile devices, tablets, and /or computers as a means to communicate with one another, I have determined the users of these devices will often store names, numbers and applicable profile identifiers in their phone's directory, speed dialing functions, and other various applicable applications. I believe that probable cause, outlined below, exists to suspect that such evidence will be secured from the devices at issue.

8. Finally, based upon my training and experience, I know that individuals who transport/harbor illegal aliens often utilize a variety of storage devices in order to conceal relative information of their illicit activities from law enforcement. Some of these devices include SD cards, SIM cards, Micro SD cards, and any other type of storage device which are often placed into devices other than that of mobile phones but are sometimes secreted within the cell phone themselves.

9. Based on the facts and circumstances outlined in this Affidavit, combined with my years of training and experience in the investigation of violations of the Controlled Substances Act, and after discussion of these facts and circumstances with other officers involved in this investigation; I believe that **Hugo Salvador Hernandez Colocho**, and others, have committed the federal criminal violations (relating to Transporting and Harboring Certain Illegal Aliens) of Title 8 U.S.C. §§ 1324 (hereafter the Target Offenses), in the Southern District of Texas and elsewhere.

10. Specifically, I submit this Affidavit in support of an Application for a Search Warrant authorizing the search of one (1) electronic device described in further detail below and in Attachment A. I believe the data contained in this device will contain evidence that shows that **Hernandez**, along with other members of illegal alien transportation organization have committed and are continuing to commit the Target Offenses. I base the information outlined in this affidavit on my own personal observations and knowledge, information related to me by other sworn law enforcement officers, and my extensive training and experience in the investigation of illegal alien transportation and harboring.

11. I believe there is currently contained in the following device's (hereafter Target Device) evidence of the commission of the Target Offenses:

 a. A white and silver Apple I Phone Smartphone Cellular Device IC Number 579C-E26428, IMEI Number 013986001243224, seized on September 18, 2014 during the execution of a search warrant at 7019 Boyce Street, Houston, Texas 77020.

12. I intend to utilize certain terms related to mobile telephones and tablets/computers through the course of this affidavit. Specifically, your Affiant utilizes the following definitions for the terms in question:

 a. **Records/Documents/Materials**: The terms "records/documents and/or materials" includes items in whatever form and by whatever means the records, documents, or materials, and/or their drafts and/or their modifications may have been created or stored;

 b. **Computer**: The term "computer," as used herein, is defined pursuant to Title 18, United States Code, § 1030(e)(1), as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device. For purposes of this Affidavit, the term "computer" or "electronic device" also includes mobile telephones, satellite phones, and tablet computers;

 c. **Computer Hardware**: Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar impulses or data, as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware;

 d. **Computer Software:** Computer software is digital information which can be interpreted by a computer or electronic device and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems and applications;

 e. **IP Address**: The Internet Protocol (IP) address is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static--that is, long-term--IP addresses, while other computers have dynamic--that is, frequently changed--IP addresses; and

 f. **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices

communicating with each other are in the same state.

## BACKGROUND OF INVESTIGATION AND PROBABLE CAUSE

13. On September 18, 2014, at approximately 0930hrs, the Houston Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Fugitive Operations Group along with Customs and Border Protection (CBP) Office of Field Operations Special Response Team (SRT) received intelligence information that an immigration fugitive was located at 7109 Boyce Street, Houston, Texas 77020. As the officers approached the front door of the residence, they observed a Hispanic male seated on an ice chest smoking what appeared to be a marijuana cigarette rolled in cigar paper. The Hispanic male identified himself as Hugo Salvador Hernandez and stated that he, his wife Areli, and their small child, were the occupants of the residence. Verbal consent to enter the residence was given by Hugo Salvador Hernandez Colocho to Deportation Officer (DO) Maria Maldonado. As the officers entered the residence, DO Roland Dolford asked Hernandez if any weapons were located inside the residence that they might encounter. DO Dolford was advised that there were 2 pistols, one in the kitchen cabinet adjacent to the refrigerator and one in the master bedroom, and a rifle located in the closet. DO Dolford retrieved the pistol from the kitchen cabinet, removed the loaded magazine, and secured the pistol during the search for officer safety. DO Maldonado during the course of identifying the occupants of the residence and determining alienage, obtained an El Salvadorian passport for Hernandez and a Mexican passport for Areli Roman Villa. DO Dolford asked Hernandez if any more drugs were in the residence and was advised by Hernandez that there was marijuana in the refrigerator. DO Dolford obtained verbal consent from Hernandez to remove the marijuana from the refrigerator.

7

14. DO Dolford contacted CBP Border Patrol Agent (BPA) David Acosta who is currently assigned as part of the Human Smuggling Task Force in Houston, Texas as part of the South Texas Area Campaign at approximately 06:57 a. m. notifying him that they had apprehended one target and were in route to another address to see if they could locate the other target. At approximately 09:45 a.m. BPA Paniagua contacted Homeland Security Investigations (HSI) SA Richard Smith BPA Acosta, Johnny Paniagua, and Raul Galicia, Jr. arrived at the residence at approximately 10:30 a.m. HSI Special Agent (SA) Laura J Gill arrived at the residence at approximately 10:50 a.m. and was shown the marijuana sitting on the dining room table along with a black, .45 caliber semi-automatic pistol on the kitchen counter. BPA David Acosta and BPA Johnny Paniagua requested consent to search the residence from Hernandez and Hernandez stated that he would not provide consent because he had already told the other officers where there were guns and marijuana. SA Gill requested that BPA Acosta provide Hernandez with a written copy of the Miranda warning while he read it to Hernandez in the Spanish language. Hernandez advised that he understood his rights and that he would consent to questioning but that he would not sign any paperwork or forms.

15. SA Gill interviewed Hernandez in the presence of BPA Acosta. Hernandez stated that when the police arrived at his residence he was seated outside smoking a joint, a slang term for a marijuana cigarette. Hernandez advised that the female police officer showed him a photograph and asked him if he knew the individual. Hernandez acknowledged that he was asked for consent to search the residence by the female officer, DO Maldonado, and that he gave verbal consent. Hernandez advised that he was asked about weapons and that he told the officer that he had guns in the house for his protection and then told the officers exactly were the guns were located. Hernandez admitted that he told the officers that he had more marijuana in the refrigerator and that it was for his

own personal use due to the constant pain he endured after being shot several times in the back. Hernandez told SA Gill that he had purchased the large amount of marijuana from "Saul" because "Saul" told him that it would be less expensive to buy larger quantities at a time as opposed to the small baggies. Hernandez informed SA Gill that he paid six hundred (600) dollars for the marijuana. Hernandez admitted that the firearms and the marijuana were his exclusively. When Hernandez was advised that he would be criminally charged with the firearms and marijuana he ended the interview and requested an attorney. The interview was terminated at this time.

16. Due to the large amount of marijuana and the presence of firearms at the residence, SA Gill requested a search warrant for the residence. SA Richard Shanks drafted the search warrant and it was presented to United States Magistrate Judge Mary Milloy. Magistrate Judge Milloy approved the search of the residence for any and all controlled substances, firearms and ammunition, drug paraphernalia, and U.S. and foreign currency.

17. During the search of the residence, agents saw, in plain view in the living areas in kitchen, papers, open ledgers, notebooks, records, and receipts indicative of human smuggling organizations. The ledgers contained names, destination cities, telephone numbers, and dollar amounts, consistent with the ledgers used by human smuggling organizations to facilitate and track the transporting of undocumented aliens. The target device was sitting on a table, not being the subject of the search, until Agents observed on the large screen that is unobscured, multiple telephone calls from numbers matching entries on the discovered ledgers. Agents noted in a ledger the breakdown of payment. One of the named payees was calling the target devices.

18. Your Affiant believes that, based upon the interviews conducted with the undocumented aliens apprehended and evidence gathered from the investigation, there exists

probable cause to believe that the electronically and/or digitally stored records and information, including telephone numbers, addresses, photographs, and/or other pertinent information as to the identity and roles of subjects or witnesses was used to facilitate the following offenses: by conspiring with others known and unknown knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(i).

25. It is my belief, that for the reasons aforementioned in this affidavit, there is probable cause that evidence relating to the commission of the Target Offense by **Hernandez** and others will be contained on the electronic devices seized from **Hernandez,** and respectfully request the Court issue a warrant authorizing the search of the target devices.

WHEREFORE, Affiant prays that a warrant be issued, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search the items listed above, attached hereto.

_____
Laura J Gill
Special Agent HSI

SUBSCRIBED AND SWORN TO BEFORE ME this the 19th day of September, 2014 and I find probable cause.

_____
Frances H. Stacy
United States Magistrate Judge
Southern District of Texas